# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,   )
                            )
                Plaintiff,   )   **CRIMINAL ACTION**
                            )
v.                          )   No. 10-10032
                            )
FELIPE RUIZ,                )
                            )
                Defendant.   )
                            )

## MEMORANDUM AND ORDER

This case comes before the court on defendant Felipe Ruiz' motions to suppress. (Docs. 17-19). The motions are fully briefed and the court conducted an evidentiary hearing on July 13, 2010. (Docs. 22, 23, 29, 30, 31). The motions to suppress are denied for the reasons herein.

**I. FACTS**

### The Search of the Piper

On January 20, 2010, at approximately 10:13 a.m., Air and Marine Operations Center ("AMOC")[1] Research Specialist Robert Keller noticed an aircraft that was traveling from an area near Las Cruces, New Mexico to Liberal Kansas. The weather was marginal and the aircraft was flying in a condition called visual flight rules because the pilot did not file a flight plan. Keller believed the aircraft was suspicious and notified Enforcement Aviation Specialist Antonio Martinez. Based upon Keller's experience and training, he believed

---

[1] "AMOC is a radar coordination center that has radar operators called detection enforcement officers who monitor the air, civilian air space[.]" AMOC's primary mission is detecting suspicious flights or criminal activity in private air aviation. (Doc. 28 at 5-6).

further investigation was necessary to determine the type of aircraft and purpose of the flight.[2]  Martinez was also aware that another aircraft carrying drugs had landed in Liberal six months prior.

AMOC contacted ICE Immigration and Customs Senior Patrol Agent Victor Montemayor.  Agent Montemayor contacted the Liberal Airport Fixed Base Operator (FBO), Lyddon Aero Center ("Lyddon Aero Center"), and told receptionist Megan Parmenter to keep an eye out for this aircraft.  The aircraft landed and was identified as N2818R Piper-PA28R ("the Piper").  The Piper was rented from Connecticut Flight Academy LLC in Hartford, Connecticut.

When the pilot came into the lobby, he identified himself as Felix Ruiz from Norwich, Connecticut.  Ruiz inquired about a hotel and requested to store the Piper in Lyddon's hangar for the night.  Ruiz purchased gas and filled out the paperwork for a courtesy car.  Ruiz' paid his $192.40 bill in cash and left.

When Ruiz left, Parmenter contacted Agent Montemayor, who wanted to know if there was anything suspicious about the Piper or Ruiz. Parmenter mentioned that Ruiz paid in cash and that it was unusual for customers to pay in cash.  Agent Montemayor told Parmenter that they had a Kansas Bureau of Investigation ("KBI") office in Liberal and they were thinking about sending some agents over.  Agent Montemayor also mentioned sending a drug dog.

Lyddon Aero Center generally put airplanes renting hangar space in the north hanger.  The hangar doors remain open until the center

---

[2] Martinez testified that pilots learn in ground school that it is smart, although not mandatory, to file a flight plan in case something happens to the airplane while in flight.

closes. Both customers and Lyddon employees have access to the planes located in the north hangar. Lyddon Aero Center has a fence around it and customers and/or employees have to go through an access gate with the code or go through the office. The building is locked at night.

Around 8:00 p.m., when Lyddon Aero Center was still open, Parmenter called the owner, Bill Lyddon, and explained the situation. Parmenter informed Bill Lyddon that the police wanted to check the north hangar where the Piper was. Lyddon instructed Parmenter to show the police the hangar and let them proceed with their investigation.

When the officers arrived, Parmenter described Ruiz to KBI Agent Shane Finely and showed him the rental agreement for the courtesy car. Parmenter mentioned that Ruiz had paid in cash and that the Piper was in the north hangar. Agent Finely asked if the north hangar was exclusively used for the Piper. Parmenter replied that it was a community hangar. Agent Finely asked if Parmenter could show them the north hangar and Parmenter replied affirmatively. Agent Finely followed Parmenter into the north hangar and checked the Piper's door, which was locked.

Agent Finely contacted Beaver County, Oklahoma Sheriff's Office and requested the assistance of a drug detection K-9. At approximately 9:30 p.m., Sheriff Rueben Parker arrived with his K-9, Kilo. At that time, Kilo was certified in Oklahoma and nationally. Liberal did not have a K-9 and had previously used Kilo for drug

detection.³

Sheriff Parker took Kilo off the leash and let him walk around the hangar. Kilo's behavior changed when he walked near the Piper. Sheriff Parker put Kilo back on the leash and worked him around the Piper. Kilo gave a positive alert just behind the wing about halfway down the Piper.⁴ Sheriff Parker continued working Kilo down the Piper. Kilo alerted near some vent holes at the tail of the Piper and again after jumping on the horizontal stabilizer (smaller wings near the tail). Sheriff Parker walked Kilo around the other side of the plane and Kilo jumped on the wing and alerted near the door. Sheriff Parker told Agent Finely that Kilo made positive alerts for the presence of a narcotic odor.

While Sheriff Parker remained with the Piper, Agent Finely went back to his office in Liberal and typed up a search warrant application. Seward County District Court Judge Peterson authorized the search of the Piper.

Agent Finely returned to Lyddon's Aero Center. He explained the situation to Lyddon and informed him that he was going to search the Piper. Agent Finely had already contacted a locksmith to open the Piper, but Lyddon provided a bucket of spare keys, one of which unlocked the Piper. Agent Finely opened the door and removed the suitcase. He noticed that it was extremely heavy and that it had two small locks. Agent Finely removed the locks and opened suitcase.

---

³ Beaver County, Oklahoma is an adjoining county to Seward County, Kansas. Liberal is in Seward County.

⁴ Kilo is a passive K-9 and will sit and stare when he detects the presence of narcotic odor. Kilo is certified for marijuana, heroin, cocaine, and methamphetamine.

Inside he found a few items of clothing on top of a zippered cover. Agent Finely unzipped the cover and saw approximately 28 bundles of kilo size packages, which later were determined to contain cocaine. Agent Finely searched the rest of the Piper and seized some notes from a clipboard, but no other drug contraband.

### The search of Ruiz' Residence

Ruiz rented a house in Norwich, Connecticut ("the rental house") from Richard Oraskovich. On February 5, 2010, Oraskovich received a letter dated January 18, 2010, from Ruiz stating that he was terminating the rental agreement effective January 31. Ruiz stated that he unexpectedly had relocated to Phoenix, Arizona. Ruiz told Oraskovich to keep the down payment and the furniture but requested that Oraskovich keep Ruiz' electronics, documents and clothing until he could return. Ruiz also stated that he would pay for the additional costs and cleaning fees.[5] At the close of the letter, Ruiz informed Oraskovich that he had changed the locks.

That afternoon, Oraskovich's wife went over to the rental house and could not get in. Mrs. Oraskovich called a locksmith who had to drill the lock to open it. The locksmith explained that he had to destroy the lock because it was tamper proof.

While the locksmith was replacing the locks, Mrs. Oraskovich began looking around the rental house and found a stack of money, approximately $8,700.00, bundled with rubber bands in the vanity of the downstairs bathroom. She called Oraskovich and told him that something was wrong and to come over.

---

[5] Two or three days later, Oraskovich received another letter from Ruiz that was nearly identical to the first.

Oraskovich arrived and looked at the money. He went inside the garage and saw two large wooden crates. He walked upstairs and found clothes all over the bedroom. Inside the office were some flight manuals and plans. Oraskovich knew that something was wrong and called the police.

When the Norwich Police Department ("NPD") officers arrived, Oraskovich showed Sergeant Edwin Peckham the cash and asked him to look through the house for other cash or items. Sgt. Peckham found the packing crates inside the garage. There were suitcases that had been torn apart in the basement. Sgt. Peckham also found what looked like prepackaged kilos of cocaine on a rafter in the basement ceiling. Sgt. Peckham brought the packages into the foyer area and walked out of the rental house and called the detectives. Detectives Blanch, Ladd, and Mickens arrived and took a quick look around the rental house. They decided to get a search warrant. After a state search warrant was obtained, the detectives seized money, computer equipment, cocaine, money counters, a camcorder, and a safe.

On or about February 18, 2010, a federal search warrant for the rental house was obtained by ICE Special Agent Peter Hsieh stationed in Hartford, Connecticut. Detective Blanch also participated in the second search. The officers took a closer look at the crates in the garage. Inside the crates were remnants of spray foam and packing peanuts with rectangular spaces in between. Detective Blanch believed the rectangular spaces matched the size of the kilos of cocaine seized in the first search. The officers also found drawings of what appeared to be the crates with the dimensions written down. Cardboard boxes containing metal money boxes were discovered. The handles from

the money boxes had been removed and they were secured inside the cardboard boxes with spray and insulation foam. Several cans of spray foam were also seized from the rental house.

### The Search of the Storage Unit

Inside the rental house, Detective Blanch found a rental agreement for a storage unit ("unit #410") in the name of Philip Reese in Norwich, Connecticut. The storage unit employees knew Ruiz as Philip Reese who rented unit #410. NPD Sgt. James Tetreault worked his K-9 Tony outside unit #410. Tony gave a positive alert for the presence of a narcotic odor. On February 19, 2010, Agent Hsieh obtained a search warrant for unit #410 but nothing significant was found.

## II. ANALYSIS

Defendant moves to suppress the search and seizure of evidence from the Piper, the rental house and unit #410. Defendant claims that the affidavits contained false or material omissions such that the search warrants were not supported by probable cause.

The parties are well aware of the standards announced in Franks v. Delaware, 438 U.S. 154, 171-2 (1978).

> "Under Franks, a hearing on the veracity of the affidavit supporting a warrant is required if the defendant makes a substantial showing that the affidavit contains intentional or reckless false statements and if the affidavit, purged of its falsities, would not be sufficient to support a finding of probable cause." (Citations omitted). "The standards of deliberate falsehood and reckless disregard set forth in Franks apply to material omissions, as well as affirmative falsehoods." (Citations omitted). If, after considering the evidence presented at a Franks hearing, the district court concludes by a preponderance of the evidence that the affidavit contains "intentional or reckless false statements," (citations omitted), or "material omissions," (citations omitted), "then the district court

>     must suppress the evidence obtained pursuant to the
>     warrant." (Citations omitted). If, however, the district
>     court concludes that the omitted information would not
>     have altered the magistrate judge's decision to authorize
>     the search, then the fruits of the challenged search need
>     not be suppressed. (Citations omitted).

United States v. Avery, 295 F.3d 1158, 1166-67 (10th Cir. 2002). Defendant must show that the affiants made intentional or reckless omissions as opposed to omissions negligently made or by innocent mistake. United States v. Artez, 389 F.3d 1106, 1116 (10th Cir. 2004).

### 1. Expectation of Privacy

Defendant contends that the affidavit for the search of the Piper contained false or material omissions because the north hangar was a secure facility and defendant had a reasonable expectation of privacy.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This protection includes entries into areas where a person has a reasonable expectation of privacy. United States v. Ludwig, 10 F.3d 1523, 1526 (10th Cir. 1993). Defendant "'bears the burden of proving not only that the search ... was illegal, but also that he had a legitimate expectation of privacy [in the north hangar].'" Id. (quoting Rawlings v. Kentucky, 448 U.S. 98, 104 (1980)).

At the evidentiary hearing, Lyddon testified that Lyddon Aero Center is open to the public during business hours and both employees and customers have access to the north hangar. The north hangar stores aircraft and equipment for both Lyddon and his customers who

-8-

pay a rental fee.  Typically, the individual airplanes inside the north hangar are locked and the keys remain with the owners.  However, the north hangar is a community hangar and Lyddon maintains control over it.  Lyddon's customers do not have access to the north hangar after business hours.

Defendant had permission to store the Piper in the north hangar, but that was all.  Defendant presented no evidence that he maintained any control or a legitimate privacy interest inside the north hangar.  Lyddon gave permission to the officers to enter the north hangar and investigate.  Therefore, the entry and search of the north hangar did not violate the Fourth Amendment because defendant had no reasonable expectation of privacy inside the north hangar.  See, e.g., United States v. Porter, 701 F.2d 1158, 1164-65 (6th Cir. 1983) (holding that the defendant had no expectation of privacy in a hangar that he was given permission to use occasionally).

**2. K-9 Sniff**

Defendant challenges Kilo's positive alerts near the Piper and focuses on the fact that Kilo was not certified in Kansas.  Accordingly, Kilo's alerts did not provide probable cause to support the search warrant.

A K-9 sniff is not a search within the meaning of the Fourth Amendment.  Ludwig, 10 F.3d at 1527.  "Of course, [police officers] may not unlawfully enter an area in order to conduct such a dog sniff[,]" Id. n. 1.  But here, the officers lawfully entered the north hangar.  See supra.  Therefore, the actual K-9 sniff by Kilo did not violate defendant's Fourth Amendment rights.

"As a general rule, a search warrant based on a narcotics canine

-9-

alert will be sufficient on its face if the affidavit states that the dog is trained and certified to detect narcotics." United States v. Kennedy, 131 F.3d 1371, 1376-77 (10th Cir. 1997). The Tenth Circuit does not require the affiant to go into the history of the K-9's training and certification. Id. at 1377. However, if the K-9 has a poor accuracy record, then probable cause may be lacking.

The affidavit for the search warrant of the Piper stated that "Sheriff Parker's K-9 is certified to detect heroin, cocaine, methamphetamine and marijuana." (Doc. 22-1 at 6). The affidavit also informed Judge Peterson that Kilo was from the Beaver County, Oklahoma Sheriff Department. These statements were true. The affidavit did not specify in what states Kilo was certified, but this is not required. See Kennedy, 131 F.3d at 1377.

At the evidentiary hearing, Sheriff Parker testified that Kilo was certified in Oklahoma and nationally. He also testified that to his knowledge, Kilo had never given a false alert out of approximately 60 times in six years. Each time Kilo had alerted in the past where no drugs were found, it was later determined that drugs had been present in that area and the narcotic odor remained.

The court finds that Kilo's history and training were sufficient to provide probable cause for the search warrant. Defendant presented no evidence that Kilo's alerts were unreliable. Defendant claims in his affidavit that Kilo could not smell the cocaine "stored in sealed individual packages in a sealed suitcase in an air tight airplane." (Doc. 22-4 at 1). Yet, defendant provides no basis to support his statement. In fact, the owner of the Piper, Arian Prevalla, testified that the Piper was not an air tight aircraft and there were a lot of

-10-

seams around the doors.[6] (Ruiz transcript, p. 100). The court credits the testimony of Sheriff Parker and Prevalla and finds that Kilo's alerts provided sufficient probable cause such that the affidavit was not false or omitted any material facts.

### 3. Expectation of Privacy in the Rental House

Defendant does not specifically allege any falsities or material omissions in the affidavits supporting the search warrants for the rental house. The government responds that defendant abandoned the rental house and consequently, had no reasonable expectation of privacy.

"The test for abandonment is whether the defendant has retained any reasonable expectation of privacy in the property." United States v. Mitchell, 429 F.3d 952, 958 (10th Cir. 2005). The court looks to defendant's intent which may be inferred from his words, acts and other objective facts. Id.

On February 5, 2010, defendant's landlord, Oraskovich, received a letter dated January 18, 2010, from defendant stating that he was terminating his lease on the rental house effective January 31, 2010. Defendant stated that he had relocated to Phoenix and asked Oraskovich to keep his belongings at Oraskovich's house. Defendant told Oraskovich to keep the furniture and he would return for his electronics, documents, and clothing. Defendant informed Oraskovich that he had changed the locks and that Oraskovich would probably need a locksmith to open the doors to the rental house.

---

[6] Prevalla testified that when he was flying the Piper a week prior to the evidentiary hearing, the wind caused one of the seams to pull a flight plan out of the Piper during the flight. (Ruiz transcript, p. 100).

Based on defendant's letter, the court finds that defendant abandoned the rental house and had no reasonable expectation of privacy. Defendant terminated the lease and told Oraskovich to store his belongings at Oraskovich's house as opposed to the rental house. Defendant knew that Oraskovich would need to enter into the rental house to retrieve his belongings and prepare the rental house for a new renter.

The federal and state search warrants for the rental house contained no false or misleading information. Furthermore, defendant lost any privacy rights protected under the Fourth Amendment when he terminated the lease. Both the federal and state officers could lawfully search the rental house after receiving permission from Oraskovich.

### 4. Unit #410

Defendant does not specifically allege any falsities or material omissions in the affidavit supporting the search warrant for unit #410. Thus, the court will not speculate as to what statements, if any, made by Agent Hsish in the affidavit in support of the search warrant for unit #410 are allegedly false or what material facts were omitted.

The affidavit in support of the search details the findings from the searches of the Piper and rental house. Agent Hsish stated that in his experience, drug traffickers often conceal quantities of narcotics, currency, firearms, receipts, instruments, and names of customers and other drug traffickers. Defendant presented no evidence that Agent Hsish's experience coupled with the findings of the two searches were insufficient to establish probable cause for the search

warrant.  Furthermore, NPD Sgt. Tetreault's K-9 gave a positive alert for narcotic odor outside the door of unit #410.  Agent Hsish's affidavit contained sufficient facts to provide the magistrate judge probable cause to issue the search warrant for unit #410.  But, apart from the K-9's alert outside the door, which is not subject to suppression, nothing was found in unit #410 to suppress.

## III. CONCLUSION

Defendant has failed to show that the affidavits in support of the search warrants for the Piper, rental house, and unit #410 contained false statements or material omissions.  The court finds that all three search warrants were supported by probable cause.  No search violated defendant's Fourth Amendment rights and his motions to suppress (Docs. 17-19) are denied.

The clerk is directed to set this case for trial.

IT IS SO ORDERED.

Dated this  17th  day of September 2010, at Wichita, Kansas.


                                        s/ Monti Belot
                                        Monti L. Belot
                                        UNITED STATES DISTRICT JUDGE